**IN THE COURT OF APPEALS OF IOWA**

No. 24-1153
Filed July 2, 2025


IN RE THE MARRIAGE OF RUSSELL DEAN PAUL, JR.
AND DIANE MARIE PAUL

Upon the Petition of
RUSSELL DEAN PAUL, JR.,
        Petitioner-Appellant,

And Concerning
DIANE MARIE PAUL,
        Respondent-Appellee.
_____


        Appeal from the Iowa District Court for Polk County, Jeanie Vaudt, Judge.


        A former husband challenges the physical-care and spousal-support provisions in a dissolution decree. **AFFIRMED AS MODIFIED.**


        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant.

        Matthew G. Sease of Sease & Wadding, Des Moines, and Carmen Eichmann of Eichmann Law Firm, West Des Moines, for appellee.


        Considered without oral argument by Tabor, C.J., and Schumacher and Chicchelly, JJ.

**TABOR, Chief Judge.**

After a fourteen-year marriage, Russell and Diane Paul divorced in September 2023. In this appeal, Russell challenges three aspects of their divorce decree. First, he contests the decision to grant physical care of their two children to Diane. Second, he contends the award of traditional spousal support was inequitable. And third, Russell argues that the district court erred in ordering him to maintain a minimum balance in his flexible spending account (FSA) for the children's unreimbursed medical expenses. In response, Diane defends the decree and seeks appellate attorney fees.

Following our independent review of the record, we decline to change the children's physical care. We also find the spousal support award achieves equity between the parties—though we modify the decree to provide that Russell's obligation ceases upon his death. We also modify the decree to terminate Russell's requirement to maintain life insurance for the benefit of the children when his child-support obligation ends. Lastly, we affirm the reasonable requirement for Russell to maintain a balance of $1500 per year in his FSA given their daughters' medical and orthodontic needs. But because we affirm the spousal support award, we find that Diane has the means to pay her own attorney fees.

## I. Facts and Prior Proceedings

Russell and Diane married in 2008. They have two daughters: A.P., born in 2010, and N.P., born in 2012. During their marriage, Russell worked as the assistant director, and then as director, of the public works department for the city of Pleasant Hill. As director, he earned nearly $134,000 per year. Diane worked

as a veterinary technician; her earnings varied through the marriage. At the time of trial, she was making about $34,000 annually.[1]

In September 2021, Russell petitioned to dissolve their marriage. At the time of the July 2023 trial, Diane was forty years old and suffered from fibromyalgia. She described her condition as causing "extreme fatigue" accompanied by painful joints, knees, feet, and back. The debilitating condition makes it difficult for her to work full-time. Russell was thirty-eight years old and, by contrast, in good health.

Their marital home was a two-story log cabin on twenty acres of land in Prairie City. Retaining that property was important to Diane because she and the girls were avid horseback riders and enjoyed caring for the animals there. But she also testified that the cabin and outbuildings needed repairs. In the decree, the court awarded the marital home to Diane, assigning a value of $359,000.[2] The outstanding mortgage debt was over $305,000 with an interest rate of 2.5 percent. The court gave Diane one year from the date of the decree to refinance the mortgage loan in her name. If unsuccessful, she was to list the property for sale.[3] The court provided this context: "Diane feels Russell is leaving her high and dry in many respects regarding the marital home. The family only resided in this residence for two and one-half years." But Diane testified that she did not want to

---

[1] The district court found that Diane netted an additional $10,000 per year from real estate rentals.
[2] In its order responding to Russell's motion under Iowa Rule of Civil Procedure 1.904(2), the court found that the home's 2023 assessed value was $453,800.
[3] The court also ordered that the equity in the marital home "shall be split equally between Russell and Diane."

move her daughters: "This is my children's home. It is where their animals are. This is the place we call home."

As for the children's custody, the district court ordered joint legal custody and awarded physical care to Diane with liberal visitation for Russell. The district court also ordered Russell to pay Diane $2000 per month in spousal support until she remarries or dies. In doing so, the court noted the length of the parties' marriage and the "considerable" difference between their incomes. And the court found that Russell was "leaving Diane adrift regarding the cabin and the costly maintenance it still requires."

Russell appeals the physical-care and spousal-support orders. He also challenges a provision mandating that he maintain a $1500 balance in his FSA for the children's uncovered medical expenses.

## II. Scope and Standard of Review

Because divorces are equitable proceedings, we review de novo. *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016). But despite our de novo review, we defer to the district court's factual findings "for institutional and pragmatic reasons." *In re Marriage of Sokol,* 985 N.W.2d 177, 182 (Iowa 2023). That "institutional deference" is a check "against undue tinkering with spousal support awards." *Id*. We will only disturb the district court's determination of spousal support when it fails to do equity between the parties. *Id.*

## III. Analysis

### A. Physical Care

Russell and Diane agreed to joint legal custody of their two daughters. But they disagreed on physical care. Russell sought joint physical care, while Diane

asked the court to place physical care with her. The district court adopted Diane's position. On appeal, Russell renews his request for joint physical care. But, as an alternative, he asks to be the primary caregiver.

Before addressing Russell's argument, we highlight our enviable options— two solid parents, who generally work together in the best interests of their daughters. Indeed, in considering physical care, our top concern is the children's best interests. *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007).

Going forward, we are guided by the factors in Iowa Code section 598.41(3) (2021),[4] as well as those set out in *Hansen*: (1) stability and

---

[4] These factors are:

      a. Whether each parent would be a suitable custodian for the child.

      b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.

      c. Whether the parents can communicate with each other regarding the child's needs.

      d. Whether both parents have actively cared for the child before and since the separation.

      e. Whether each parent can support the other parent's relationship with the child.

      f. Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.

      g. Whether one or both of the parents agree or are opposed to joint custody.

      h. The geographic proximity of the parents.

      i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.

      j. Whether a history of domestic abuse, as defined in section 236.2, exists. . . .

      k. Whether a parent has allowed a person custody or control of, or unsupervised access to a child after knowing the person is required to register or is on the sex offender registry . . . .

Iowa Code § 598.41(3).

continuity, (2) communication and mutual respect between parents, (3) the degree of discord between parents, and (4) the extent of agreement between parents on routine care. 733 N.W.2d at 700 (providing four considerations for joint physical care). "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.* at 695.

Russell attacks the district court for rejecting joint physical care without explicitly analyzing the *Hansen* factors. *See* Iowa Code § 598.41(5)(a) (requiring that when a parent requests joint physical care, the court's decision to award physical care to one parent must be "accompanied by specific findings of fact and conclusions of law that the awarding of joint physical care is not in the best interest of the child").

It's true that the decree did not include a lengthy explanation for rejecting Russell's request for joint physical care. But the district court did say that an equal split of physical care was "totally unrealistic under the facts presented" and was not in the best interests of A.P. and N.P. The court pointed to Russell's "inflexibility" when it came to sharing care of their daughters.[5] Although terse, that rationale— along with our own reading of the record—allows us to review the physical-care determination. *See Hall v. Weissenburger*, No. 22-1926, 2023 WL 5065185, at *2 (Iowa Ct. App. Aug. 9, 2023).

---

[5] The court accepted Diane's testimony that Russell would engage in "an extreme amount of negotiating" when she wanted to change the parenting schedule: "He wants time back that I am taking, he feels, from him with the children." Russell gave a contradictory view, insisting that he would "always agree in the ability to be flexible with the schedule." But the court found Diane to be the more credible witness.

Turning to the merits, we build from the premise that "[p]hysical care issues are not to be resolved based upon perceived fairness to the *spouses*, but primarily upon what is best for the *child*[*ren*]." *Hansen*, 733 N.W.2d at 695. Joint physical care is not the best arrangement for children if the parents have trouble communicating, show deep discord, or harbor profound disagreements on routine care. *See id.* at 698–99. The record here showed minor communication difficulties and some personal conflict between the parents. For example, Diane recounted recent "combative text messaging" from Russell over her request to alter the exchange schedule for the girls. But overall, the parents' disagreements did not interfere with their ability to act in the children's best interests. *See Hensch v. Mysak*, 902 N.W.2d 822, 827 (Iowa Ct. App. 2017).

But the scales tip away from joint physical care when we look at the stability and continuity of caregiving. *Hansen* expressed those concepts in terms of "an approximation rule, namely, that the caregiving of parents in the post-divorce world should be in rough proportion to that which predated the dissolution." 733 N.W.2d at 697. Before the separation, Diane took the role of chief caretaker for their daughters as they navigated their way through early childhood. *See id.* at 697–98 ("[W]here one spouse has been the primary caregiver, the likelihood that joint physical care may be disruptive on the emotional development of the children increases."). Granted, that role was possible because Russell worked as the primary breadwinner. But, as noted, we look to the children's best interests and not the perceived fairness to either parent.

The record is flush with examples of Diane's commitment to child-rearing. She was a stay-at-home mom who arranged the children's playdates and medical

appointments. Once they reached school age, Diane often volunteered in their classrooms. When the girls were sick, she would stay home with them. While Russell was also an active parent, his daily participation did not come close to matching Diane's caregiving role. And as the district court emphasized, Russell's rigidity on parenting time did not bode well for a smooth shared-care arrangement post-divorce.

After considering the relevant factors and the district court's credibility determinations, we find that the children's best interests are served by affirming the grant of physical care to Diane.

## B. Spousal Support

In his next assignment of error, Russell contends that the spousal-support award failed to do equity. Primarily, he contends their fourteen-year marriage was too short to justify traditional alimony without another factor at play. *See, e.g.*, *In re Marriage of Mills*, 983 N.W.2d 61, 71–72 (Iowa 2022) (affirming award of traditional alimony after marriage of fourteen years based on spouse's permanent disability and lack of earning capacity). In Russell's view, Diane's fibromyalgia is not that factor. He notes that Diane did not document her condition with medical records. He also questions the gravity of her disability, stressing that it did not prevent her from pursuing her equestrian hobby. At trial, Russell acknowledged that he knew about Diane's diagnosis since 2015 or 2016. He also testified that she discussed her symptoms. Yet he did not believe that it was "at a point where it would cripple her from doing what she wanted to do."

Despite Russell's skepticism, the record shows that Diane's diagnosis of fibromyalgia limited her ability to work full time as a veterinary technician. She testified about the symptoms that prompted her to seek medical treatment:

> Extreme fatigue. My joints, knees, feet, up into my back would sometimes be swollen, extremely painful. Ibuprofen seemed to help, but not a lot. My feet were the worst. It felt like I was walking on pins and needles, and that would then travel up into my back. Time off my feet is what really helped overall, and being able to rest when I needed to, when it would flare up, helped a lot. I also tried arch supports specifically to help, and I tried compression hose that were specifically fitted for me, prescribed by a doctor. And while those helped, they didn't really fix . . . anything. If I went right back to work, . . . it was always there. It was always painful.

She also described the physicality of her job, including lifting large dogs for surgery and cleaning kennels. And she testified that when her symptoms flared up, she could not go into work: "Time off is what helped." She explained that she tries to log thirty hours per week so that she can qualify for health insurance and benefits. In her current job, she does not receive paid sick leave or vacation.

Against that factual backdrop, we turn to the legal analysis. Traditional spousal support is most often justified when a marriage has lasted at least two decades. *In re Marriage of Gust,* 858 N.W.2d 402, 410–11 (Iowa 2015). But *Gust* did not impose a "a bright-line test" at the twenty-year durational threshold. *In re Marriage of Nelson*, No. 15-0492, 2016 WL 3269573, at *3 (Iowa Ct. App. June 15, 2016). Rather, the duration of a marriage is just one factor to consider in the statutory framework. *Sokol*, 985 N.W.2d at 185 (invoking criteria listed in Iowa Code section 598.21A(1)). True, our supreme court has explained that a district court's discretion narrows when it awards spousal support outside of generally

recognized categories.  *See id*. at 186 (citing *Mills*, 983 N.W.2d at 73).  Yet, the enduring inquiry is whether the award does equity between the parties.

The award of traditional spousal support was equitable here because Russell has a much greater earning potential than Diane.  His income was more than three times hers at the time of the decree.  Diane had a two-year associate's degree that she earned before their marriage.  Russell had more education—a bachelor's degree in environmental studies, plus a certificate in public administration that he obtained during the marriage.[6]  Beyond these educational disparities, Diane's earning capacity was limited by her assumption of the major child-care duties[7] and her debilitating diagnosis of fibromyalgia.  The district court also emphasized that Russell was "leaving Diane adrift regarding the cabin" and the costs of delayed maintenance that the acreage required.

To counter, Russell asserts that Diane left the marriage with "significant assets" and downplays the repair expenses associated with the log cabin.  But as Diane argues on appeal: "it is not in serious dispute [she] has significantly higher monthly expenses than her current income."  She submitted a list of estimated expenses for the log cabin that surpassed $30,000.  We find those expenses of maintaining the marital home contribute to her need for spousal support.

Russell next contends that if Diane is entitled to any support, it would be transitional rather than traditional alimony.  *See In re Marriage of Pazhoor*, 971 N.W.2d 530, 541–42 (Iowa 2022) (recognizing new alimony category to give

---

[6] The parties devoted a large portion of an inheritance Diane received from her father to pay off Russell's student loans.

[7] Russell acknowledges that this division of labor was a joint decision made during their marriage that benefitted the family.

"short-term support" to transition spouses from married to single life). We disagree with that contention. First, transitional support was not an option that Russell raised at trial. There, he urged the court to award no alimony. Focusing on the factors in section 598.21A(1), we find that it would not be feasible for Diane to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage without traditional spousal support. A short-term transfusion of funds would not do equity, especially given her health limitations.

Finally, Russell argues that, at a minimum, his spousal-support obligation should not extend beyond his death. He notes that the district court did not explain why it did not include Russell's death as one of the conditions terminating his support obligation. "The general rule is that periodic payments of alimony are presumed to terminate upon the payor's death." *In re Marriage of Klinghammer*, No. 02-0112, 2003 WL 21070599, at *3 (Iowa Ct. App. May 14, 2003). Like the *Klinghammer* court, we find no reason to depart from that general rule here. *See id.* Accordingly, we modify the decree to provide that Russell's spousal support obligation ceases upon his death as well as upon the conditions specified by the district court. We also modify the decree to terminate Russell's requirement to maintain life insurance for the benefit of A.P. and N.P. when his child-support obligation ends.

### C. Flexible Spending Account

In his final claim, Russell objects to the district court's order that he maintain $1500 per year in his FSA for the children's uncovered medical expenses. He describes the account as "use it or lose it" and argues that it would be inequitable to require a minimum balance that might be lost due to nonuse. He also suggests

that because it is an employer-based benefit, if his employer eliminates that benefit, he may be "at risk for a contempt action." On that second point, we read the decree only to require the minimum contribution of $1500 to the FSA so long as that benefit is available. Otherwise, we see the modest contribution requirement as reasonable given the daughters' health needs. For example, A.P. has scoliosis and may need occasional physical therapy treatments. Plus, both girls have braces, and the parents have used the FSA to cover those orthodontic costs. We decline to modify that aspect of the decree.

### D. Appellate Attorney Fees

After responding to Russell's challenges, Diane asks us to order him to pay $7500 toward her appellate attorney fees.[8] We have discretion whether to award attorney fees in an appeal of a dissolution decree. *In re Marriage of Samuels*, 15 N.W.3d 801, 808 (Iowa Ct. App. 2024). In exercising that discretion, we consider Diane's needs, Russell's ability to pay, and the relative merits of the issues raised on appeal. *See id.* Considering these factors, we decline Diane's request. While Diane prevailed on appeal, Russell's claims were close calls that merited consideration by our court. And because we affirm the award of traditional spousal support, Diane has the means to pay her own attorney fees. *See In re Marriage of Hanna*, No. 16-1482, 2017 WL 4315050, at *6 (Iowa Ct. App. Sept. 27, 2017). But the costs of this appeal are assessed against Russell.

**AFFIRMED AS MODIFIED.**

---

[8] The record does not show that counsel filed an attorney-fee affidavit.